The REPUBLIC OF THE PHILIPPINES and National Power Corporation, Plaintiffs,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Westinghouse International Projects Company, and Burns and Roe Enterprises, Inc., Defendants.

Civ. A. No. 88–5150.

United States District Court, D. New Jersey.

May 18, 1989.

Shaw, Pittman, Potts & Trowbridge by Mark Augenblick, James B. Hamlin, Matias F. Travieso–Diaz, Michael A. Schlanger, Washington, D.C., Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein by Paul A. Rowe, Alan S. Naar, Woodbridge, N.J., Reichler, Choate, Appelbaum & Wippman by Paul S. Reichler, J. Samuel Choate, Jr., Judith C. Appelbaum, J. Patrick Hickey, Arthur V. Medel, Clifford & Warnke by Paul C. Warnke, Washington, D.C., for plaintiffs the Republic of the Philippines and National Power Corp.

Shanley & Fisher, P.C. by Raymond M. Tierney, Jr., Morristown, N.J., Cravath, Swaine & Moore by David Boies, Robert D. Joffe, Brooks Burdette, William Wilson, Alvin Vickery, New York City, Rogovin, Huge & Schiller by Johnathan D. Schiller, Randall L. Speck, Gary K. Harris, Randall Melch, Peter Brody, Catherine Fisk, Bradley Campell, Washington, D.C., for defendants Westinghouse Elec. Corp. and Westinghouse Intern. Projects Co.

Stein, Mitchell, & Mezines by Glenn Mitchell, Washington, D.C., McCarter & English, P.C. by W.C. McCarter, Newark, N.J., Cahill, Gordon & Reindel by Michael P. Tierney, Thomas J. Kavaler, Jonathan D. Thier, New York City, for defendant Burns & Roe Enterprises, Inc.

## OPINION

DEBEVOISE, District Judge.

This is an action brought by the Republic of the Philippines and the National Power Corporation ("NPC"), the Philippine government agency responsible for electric power generation, against Westinghouse Electric Corporation ("WECOR"), a Pennsylvania corporation, Westinghouse International Projects Company ("WIPCO"), a wholly-owned subsidiary of WECOR (these entities are sometimes referred to collectively as "Westinghouse") and Burns and Roe Enterprises, Inc. ("Burns & Roe"), a New Jersey corporation. This case arises out of the construction of the 600–megawatt Philippines Nuclear Power Plant Unit 1 ("PNPP") in Bagac, Bataan during a ten-year period commencing in 1976. The fifteen-count complaint alleges breach of contract, fraud, tortious interference with fiduciary duties, negligence, civil conspiracy, RICO violations, antitrust violations and various pendent state claims. Defendants moved to stay this action pending arbitration pursuant to contractual arbitration clauses and Section 3 of the Federal Arbitration Act of 1925, as amended, 9 U.S.C. sec. 3, and/or pursuant to the court's inherent power to manage its docket. This motion has been vigorously contested by both sides and the parties have been permitted to file several supplemental briefs and affidavits.

### I. The Background of the Dispute

Some understanding of the complaint's factual allegations is required in order to address knowledgeably the issues raised by this motion. For the purposes of this discussion only, plaintiffs' allegations will be accepted as true.

In the summer of 1973, Ferdinand E. Marcos, then President of the Republic of the Philippines, announced his government's decision to build the nation's first nuclear powerplant. Affidavit of Ramon R. Ravanzo dated Oct. 21, 1988 ("Ravanzo Affidavit"), para. 2. A number of foreign companies with technical expertise sought to obtain at least a piece of what promised to be a lucrative project. Westinghouse sought the contract for the construction of the plant's nuclear steam supply system and Burns & Roe was interested in obtaining the architect/engineering ("A/E") contract for the project.

Plaintiffs allege that, after consulting with Westinghouse sales employees who operated in the country, both Westinghouse and Burns & Roe concluded that the way in which business was done in the Philippines required the retention of a special sales representative ("SSR") who had both access to and influence in Malacanang, the presidential palace, if they were to have a chance of obtaining the contract. Since 1972, when Marcos declared a state of martial law, Marcos had ruled the nation largely by decree and his direct assent to

such a high-profile project was considered essential. The complaint alleges that it was understood that the SSR would offer Marcos a "piece of the action" in order to obtain his endorsement of the bidders.

Westinghouse and Burns & Roe ultimately came to retain Herminio T. Disini as their SSR under separate agreements. Disini was a well-known Philippine businessman and close personal friend of President Marcos whose wife was also Mrs. Marcos' cousin and personal physician. The first test for Disini, even before any formal SSR agreements were entered, was to obtain the NPC project consulting contract for Burns & Roe.

Since the NPC had no expertise in the construction of nuclear power plants, it sought to enter a consulting contract to obtain technical advice and to assist it in selecting between competing project bidders. Although Burns & Roe bid for this contract, NPC announced its intention to award the contract to a competitor, Ebasco Industries, Inc. The Westinghouse and Burns & Roe Philippine operatives agreed that this prospect spelled disaster for their chances at the project since Ebasco was known to be a corporate ally of General Electric, a Westinghouse competitor, and would be expected to assert its influence with NPC on behalf of its confederate. Disini allegedly boasted to Burns & Roe that he could obtain a turnkey contract for PNPP project for Westinghouse including an A/E subcontract for Burns & Roe. Burns & Roe gave Disini the green light and requested that he intervene on their behalf. Days later, Marcos, directed NPC to award the consulting contract to Burns & Roe.[1]

This demonstration of influence ultimately persuaded Westinghouse to retain Disini as SSR, agreeing to commission payments of three percent of the total contract price to be paid to various Disini-controlled corporations. Like Burns & Roe, Westinghouse allegedly knew that these commission payments were being passed through Disini to Marcos. Westinghouse wrote

Marcos to request an opportunity to present a proposal for a turnkey contract for PNPP. Marcos agreed to hear Westinghouse and wrote the NPC to tell it he was meeting with Westinghouse.

At the Westinghouse presentation in May 1974, Marcos directed Westinghouse to use Burns & Roe as the project A/E subcontractor. Two weeks after the meeting, Westinghouse wrote Marcos requesting a commitment letter for the entire project. Marcos forwarded the letter to his Executive Secretary, Alejandro Melchor, who was also a member of the NPC Board, with a handwritten notation stating that if Westinghouse could deliver the financing terms discussed, "let us give them a letter of commitment." The following day, Marcos issued an order directing NPC General Manager Ravanzo to negotiate a turnkey contract for the construction of PNPP with Westinghouse.

In obedience to this directive, the NPC entered into contract negotiations with Westinghouse. Ravanzo established a negotiating committee comprised of three subgroups: a technical panel, a commercial panel and a legal panel, each comprised of NPC officials who were to meet with their Westinghouse counterparts in lengthy negotiations over the course of 1975. Looking back on that time, General Secretary Ravanzo recalled that Westinghouse refused to negotiate any critical contract terms:

> NPC objected to many of the provisions proposed by Westinghouse, including the risk of loss, payment schedule, warranties, arbitration and liability limitation clauses. However, our efforts to negotiate better terms were frustrated because Westinghouse knew that it had the President's support and that NPC could not go to any other supplier for the nuclear plant. Therefore Westinghouse could get whatever terms it wanted, and NPC was powerless to bargain effectively. It was the first time in my experience that we were negotiating a contract in which

---

1. Marcos' authority to "order" NPC to enter the consulting contract with Burns & Roe is an issue of some importance to this motion that will be treated at greater length below.

I knew from the outset that we did not have a chance.

Ravanzo Affidavit para. 7.

Plaintiffs allege that when negotiations hit a snag, Disini would be called upon to intervene and, in response, Marcos would call Ravanzo to urge him into action. Frustrated with the slow progress of negotiations, Marcos at one point allegedly ordered the parties onto a Philippines naval vessel and gave the captain orders to cruise Manila Bay until agreement on certain provisions was obtained.

Among the terms in the Westinghouse draft contract considered by the legal panel, was the arbitration clause, Article 24. An alternate member of the NPC legal panel who was apparently actively involved in negotiations, Agripino E. Bagcal, recalled that Westinghouse was intransigent during negotiations and even indicated at one point that the terms in the draft contract were nonnegotiable. Affidavit of Agripino E. Bagcal ("Bagcal Affidavit"), dated Oct. 24, 1988, para. 3. Bagcal recalled that Article 24 was "lengthily discussed." *Id.* at para. 4. Because of bad experience with arbitrations in the past and because the Westinghouse draft contract was thought to favor the drafter, NPC wanted the procedural protections available in a judicial forum. *Id.* The parties' disparate positions on this issue are reflected in the minutes kept by Bagcal of the first meeting of the legal panel on January 24, 1975. Bagcal Affidavit Exhibit A. Apparently Westinghouse continued to insist on the inclusion of the arbitration clause and the parties were soon at an impasse.

The minutes of the next meeting of the legal panel reflect that some minor modifications were made to the arbitration clause. Bagcal Affidavit Exhibit B. The arbitration clause was again discussed at the April 18, 1975 meeting of the legal panel. Westinghouse's feet were still in cement on the issue. At this point, Westinghouse acceded to the clause and the parties agreed on languages pledging to use their "best efforts" to resolve any disputes arising out the contract informally before they were referred to arbitration.

According to Bagcal, the NPC team surrendered on this point because it became clear to them "that Westinghouse was extremely intractable and was not likely to compromise." Bagcal Affidavit at para. 6. Bagcal also observed that "we were under pressure to move forward with the negotiations because according to Mr. Ravanzo, that was the order of the higher authority in government." *Id.* This "higher authority" was Marcos.

Negotiations on other points continued throughout the year with occasional interventions by President Marcos. In November, 1975 a final draft was submitted to the Philippine Solicitor General for review. In separate memoranda directed to both Ravanzo and Marcos he recommended that the contract not be signed. Affidavit of Estelito P. Mendoza, dated Nov. 21, 1988, Exhibits A & B. This counsel was ignored, however, and the contract was signed in a formal ceremony on February 9, 1976 and approved by Marcos two days later. Affidavit of Marcelino C. Ilao dated Feb. 6, 1989 at para. 16.

The plaintiffs allege that in addition to the commission payments paid to Disini corporations by defendants that were funneled to Marcos, Marcos benefited financially by the construction of the plant through a complex network of financial interests in various Disini enterprises that performed work as Westinghouse subcontractors. Thus Marcos allegedly directed that a Disini-controlled company, Power Contractors, Inc., be awarded the civil/structural construction subcontract although it had done no comparable work and despite NPC's objections. Similarly, although NPC objected to the selection of the Engineering and Construction Co. of Asia, owned by a company controlled by Marcos' brother-in-law, as the mechanical and electrical installation subcontractor because of the company's poor reputation, Westinghouse nonetheless awarded it the contract. In addition, a Disini-owned insurance company underwrote half of the construction risk of the project, although a private insurer had never before been permitted to underwrite a government con-

struction project, and another Disini company was selected to serve as PCI's purchasing agent.

## II. The Applicable Legal Standards

The critical provisions of the Arbitration Act, for the purposes of this case, are Sections 2, 3 and 4, 9 U.S.C. secs. 2, 3, 4. Section 2 provides that a written agreement to resolve disputes through arbitration in a "contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Section 3 requires a federal court in which suit has been brought "upon any issue referable to arbitration under an agreement in writing for such arbitration" to stay the court action pending arbitration once it finds that the issue is arbitrable under the agreement. Section 4 is not directly relevant to the present motion, brought under Section 3, but is nonetheless useful as a point of reference. It permits a party "aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration" to obtain an order compelling arbitration if the court determines that an agreement exists and that it has not been honored.

█ The initial question raised by this motion is whether the plaintiffs' allegations of bribery may be considered in determining whether the action should be stayed pending arbitration. Defendants argue that under the doctrine announced by the Supreme Court in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the allegations are properly directed to the arbitration panel and not the court.

In *Prima Paint* the purchaser of a paint business which entered into a consulting contract with the corporate seller to commence after the sale sought rescission of the contract on the grounds that the seller fraudulently represented that it was solvent and able to perform the contract when, in fact, it had filed a petition under Chapter 11 of the Bankruptcy Code shortly after execution of the agreement. 388 U.S.

at 398, 87 S.Ct. at 1803. The seller argued that the contract's arbitration clause governed even allegations of fraud directed to the entire contract.

The Supreme Court noted that the issue was settled under Section 4 of the Act which permits the court to issue an order compelling arbitration only if "the making of the agreement for arbitration" is is not in issue. *Prima Paint*, 388 U.S. at 403, 87 S.Ct. at 1806.

> Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider the claims of fraud in the inducement of the contract generally.

388 U.S. at 404, 87 S.Ct. at 1806. Although the case before the Court arose under Section 3, the Court ruled that this reasoning applied to that Section as well because it was "inconceivable that Congress intended the rule to differ depending upon which party to the agreement first invokes the assistance of a federal court." *Id.*

Thus under either section 3 or 4, the arbitration clause is to be treated as conceptually "separable" from the remainder of the contract. "[I]n passing upon a section 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Prima Paint*, 388 U.S. at 404, 87 S.Ct. at 1806. The Court concluded that the language of the Act, and the clear Congressional purpose that the arbitration proceeding selected by the parties "be speedy and not subject to delay and obstruction in the courts" supported this result. *Id.*

The result in *Prima Paint* is not wholly logical. It leaves federal courts with the rather rare and narrow issue of whether fraud was directed specifically to the arbitration clause while passing the more frequent and usually more complex question of whether fraud was directed to the entire contract to the arbitration panel, a group chosen more for their technical knowledge

than their legal skills. This approach also seems to run counter to Article 2's broad declaration that a written arbitration agreement be considered valid and enforceable "save upon such grounds as exist at law or equity for the revocation of any contract."

Nonetheless subsequent Supreme Court cases have confirmed that *Prima Paint* is alive and healthy and, if nothing else, the case has come to stand as an expression of the Court's militant determination to enforce arbitration agreements freely chosen by the parties. The challenge for the party who believes himself to be the victim of a fraud and wishes to fight it out in court is to demonstrate that the fraud was specifically directed to the arbitration clause or to convince the court to craft some exception to the *Prima Paint* doctrine.

■ Plaintiffs first argue that bribery should not be treated as fraud in the inducement but as a species of fraud in factum (or fraud in the execution) that vitiates NPC's assent to the agreement and makes the contract void ab initio. Plaintiffs, relying primarily upon *Cancanon v. Smith, Barney, Harris, Upham & Co.*, 805 F.2d 998 (11th Cir.1986), argue that the defense of fraud in factum creates an exception to *Prima Paint's* separability rule.

*Cancanon* was a securities fraud action brought by purchasers of a money market account who alleged that the defendant brokerage firm wasted their principal in unauthorized trading. The account agreement, a form contract, contained an arbitration clause and the defendant moved for an order compelling arbitration pursuant to Section 4 of the Arbitration Act. Plaintiffs, who did not speak English, argued that since defendant represented that the contract was for a money market account, plaintiffs had never assented to a contract for a securities account. Plaintiffs argued that this fraud in factum, as opposed to fraud in the inducement, voided the entire contract including the arbitration clause and therefore overcame the *Prima Paint* separability doctrine. 805 F.2d at 999–1000.

The *Cancanon* Court adopted the plaintiffs' position. Citing the Restatement of Contracts, the court observed that "[w]here misrepresentation of the character or essential terms of a proposed contract occurs, assent to the contract is impossible. In such a case there is no contract at all." *Cancanon*, 805 F.2d at 1000. Thus, "where the allegation is one of fraud in factum, i.e., ineffective assent to the contract, the issue is not subject to resolution pursuant to an arbitration clause contained in the contract document." *Id.*

Several other cases have taken positions consistent with this approach. In *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51 (3d Cir.1980), for instance, the defendant argued that certain documents, which the plaintiff contended were contracts, were signed only as confirmations of delivery dates. 636 F.2d at 53. The court observed that the "mere execution of a document.... even assuming that it is executed by a corporate agent, does not negate the factual assertion that such signature was not intended to represent a contractual undertaking." *Id.* at 54–55. If such a defense were mounted against a motion to compel arbitration under Section 4 of the Act, and if the allegations were set forth in an affidavit, a proceeding held before the case was committed to arbitration and limited to the issue of whether or not an agreement had been reached would be appropriate. *Id.* at 55. *See also Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir.1972); *Dougherty v. Mieczkowski*, 661 F.Supp. 267, 274–75 (D.Del.1987).

Even if allegations of fraud in factum created an exception to *Prima Paint* doctrine, however, the allegations in the complaint do not set forth such a claim. As the *Cancanon* court made clear, fraud in factum exists where there is a "misrepresentation of the character or essential terms" of a contract. As the authors of the Restatement expressed it:

If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who *neither knows nor has reasonable opportunity to know of the character or*

*essential terms of the proposed contract,* his conduct is not effective as a manifestation of assent.

Restatement of Contracts (Second) sec. 163 (emphasis added). As noted in explanatory comments accompanying this section, "[t]he party may believe that he is not assenting to any contract or that he is assenting to a contract entirely different from the proposed contract." *Id.,* Comment A. *See also Langley v. Federal Deposit Ins. Corp.,* 484 U.S. 86, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987) (Fraud in factum is "the sort of fraud the procures a party's signature to an instrument without knowledge of its true nature or contents."); *Southwest Administrators, Inc. v. Rozay's Transfer,* 791 F.2d 769, 774 (9th Cir.1986) ("[Fraud in inducement] induces a party to assent to something he otherwise would not have; [fraud in factum] induces a party to believe the nature of his act is something entirely different than it actually is."); 12 *Williston on Contracts* sec. 1488 (3d Ed.1970).

These explanations demonstrate that the fraud in factum doctrine is inapposite in the present situation. There is no question but that the NPC officials negotiating the contract were fully aware of the nature of its terms; that is why they resisted the Westinghouse draft and why Marcos, in turn, was repeatedly forced to bring pressure to bear in order to override their opposition. Plaintiffs do not claim, nor can they, that they were duped or deceived as to the nature or terms of the agreement as they must in order to make out a claim for fraud in factum. They understood the contract all too well.

██ What plaintiffs' actually allege is a defense of duress or coercion: Marcos allegedly received payments in return for which he used his power and influence to force the NPC to assent to an oppressive, one-sided agreement. *Cancanon* itself, however, takes pains to distinguish these defenses from those of fraud in factum.

In *Merrill Lynch, Pierce, Fenner & Smith v. Haydu,* 637 F.2d 391 (5th Cir. Unit B 1981), a stock brokerage customer who signed options trading agreements with arbitration clauses claimed that she had been distracted and coerced by high pressure sales talk amounting under the circumstances to confusion, undue influence and duress. The *Cancanon* court observed that "[t]hese were not allegations of ineffective assent, but rather of fraud in the inducement of a contract.... Thus the [*Haydu*] court properly held that these allegations were subject to resolution by arbitration." *Cancanon,* 805 F.2d at 100 n. 5.

Plaintiffs argue that coercion through bribery is a form of coercion so different in degree and kind that it rises to the level of fraud in factum. Perhaps there is some form of coercion so extreme that is equivalent to a lack of assent. That is not this case, however, and plaintiffs' attempts to force the doctrine to fit their allegations would contort the doctrine beyond recognition.[2]

Alternatively, if plaintiffs could demonstrate that the coercion or duress were directed specifically to the arbitration clause, this would satisfy *Prima Paint* and it would be appropriate to have a hearing on this issue. It is clear that plaintiffs have raised a material issue of fact with respect to whether or not the "commission" payments specifically induced assent to the arbitration clause.

As plaintiffs' own papers demonstrate, however, any payments ultimately received by Marcos could not be the basis for voiding the contract or any of its clauses since Marcos was not acting as a third party who coerced the NPC to contract but as the ultimate authority of the nation who had full power to commit the NPC to the contract.

Plaintiffs' complaint explains at some length the scope of power Marcos exercised over the Philippines. The following politi-

2. The plaintiffs' attempts to have the contract declared void ab initio have a hollow ring. The PNPP contract was entered into some thirteen years ago. Although Marcos was deposed in 1986, the new government continued to honor the terms of the contract until it commenced this suit.

cal analysis is drawn from paragraphs 4 through 9.

In 1972, just before the end of his second elected term as President, President Marcos issued Proclamation No. 1081 declaring a state of martial law in the Philippines. Marcos subsequently abolished the congress and assumed legislative power through the issuance of presidential decrees, orders, proclamations, letters of instruction and directives. In General Order No. 1 issued on September 22, 1972 Marcos provided that "I shall govern the nation and direct the operation of the entire Government, including all its agencies and instrumentalities, and in my capacity shall exercise all the powers and prerogatives appurtenant and incident to my position as Commander in Chief of all the Armed Forces of the Philippines." General Order No. 3, issued at the same time, prohibited the judiciary from considering any case involving the validity, legality or constitutionality of the Proclamation declaring martial law or any of the actions Marcos took in form of decisions and orders under the authority of martial law.

On January 17, 1973, Marcos issued Proclamation No. 1104 deciding that martial law would continue in force indefinitely. Also on that date Marcos issued Proclamation No. 1102 declaring that the people had "ratified" a new constitution. This constitution legitimized all orders and decrees previously issued by Marcos and empowered him to rule through the issuance of orders and decrees in the future. When a case presented the Philippines Supreme Court with the issue of the new constitution's legality, Marcos allegedly summoned the justices to Malacanang palace and threatened to declare a revolutionary form of government if they invalidated the constitution. Ultimately the Supreme Court held that, although the constitution had not been properly ratified by the people, its validity was a political question beyond the competence of the Court.

Beyond his general self-assumed authority as dictator, Marcos also promulgated directives that gave him specific authority over the NPC. About the time that negoti-

ations on the PNPP contract began in earnest, Marcos issued Presidential Decree No. 380. Pursuant to his authority established under the new constitution and General Order No. 1, Marcos made certain changes through this order to the NPC charter. Section 11 of the decree modifies Section 15–A of the Charter to place the NPC "under the direct supervision of the Office of the President ..." Significantly Marcos "authorized" the General Manager of the NPC to enter into a contract with Westinghouse, see Affidavit of Alejandro Melchor, dated Nov. 9, 1988, Exhibit H, and after the contract was signed nonetheless "approved" it, see Affidavit of Marcelino C. Ilao, dated Feb. 6, 1989 at para. 16.

Plaintiffs argue that under the law of the Philippines the NPC was a separate juridical entity that Marcos was without legal authority to direct or control. In support of this proposition, plaintiffs, pursuant to Fed.R.Civ.P. 44.1, submit the affidavit of Edurardo G. Montenegro, an undersecretary in the Department of Justice of the Republic of the Philippines.

Montenegro observes that the Philippines Supreme Court has stated that the NPC "has a personality of its own, distinct and separate from that of the Government." Montenegro Affidavit para. 3 quoting Rayo v. CFI of Bulacan, 110 SCRA 456, 460 (1981) (Supreme Court of the Philippines). He notes that the NPC Charter, even after amendments by Marcos, required that construction contracts be awarded exclusively on the basis of competitive bidding. Montenegro Affidavit para. 5; Charter paras. 9, 10. Montenegro concedes that the President had certain specific duties related to the NPC and that the agency was under the President's "direct supervision." However, under "well-established Philippine precedents," according to Montenegro, "supervision" is a term of art in administrative law that is comparatively limited in scope:

In administration law supervision means overseeing or the power or authority of an officer to see that subordinate officers perform their duties. If the latter fail or neglect to fulfill them the former may take such action or step as pre-

scribed by law to make them perform their duties. Control, on the other hand, means the power of an officer to alter or modify or nullify or set aside what a subordinate officer had done in the performance of his duties and to substitute the judgment of the former for that of the latter.

Montenegro Affidavit para. 6, quoting *Mondano v. Silvosa*, 51 Official Gazette No. 6 2884, 2888 (1955) (Supreme Court of the Philippines).

In conclusion Montenegro finds "no support in the laws of the Republic of the Philippines for the proposition that in 1974 —1976 President Marcos had authority to direct that PNPP contracts be awarded to Westinghouse and Burns & Roe contrary to NPC's wishes and in derogation of the established competitive bidding requirements." Montenegro Affidavit para. 8.

The authority marshalled by Montenegro, however, does not necessarily support the conclusion he reaches. Although Marcos may not have had authorization under the NPC Charter to direct the "operational affairs" of the NPC, it is clear that through the issuance of presidential decrees and other orders that he could control whatever aspect of the governmental machinery that attracted his attention. Plaintiffs do not dispute that these fiats were legal under then-existing domestic law or that they were obeyed by government agencies and the citizenry.

Under Section 74 of the Revised Administrative Code (Act No. 2711) as it was in force during the relevant period, as Montenegro points out, Marcos had broad powers over governmental agencies:

> All executive functions of the Government of the Republic of the Philippines shall be directly under the Executive Department, subject to the *supervision and control of the President of the Philippines in matters of general policy.*

Montenegro Affidavit para. 7 (emphasis supplied).

Thus Marcos had broad powers to direct the operational activities of the NPC as they related to matters of general policy. The construction of the nation's first nuclear power plant is not a typical agency project. Its construction was a matter of national policy that was directly authorized by Marcos in August 1973. Ravanzo Affidavit para. 2. In an investment of this magnitude, the selection of the contractor becomes a policy matter because—especially in the case of a turnkey contract—it is the primary factor that determines the ultimate success of the project.

It is equally clear that the competitive bidding provisions of the Charter were not meant to apply to a project of this magnitude. However, even if the award of the contract in derogation of the competitive bidding requirements were illegal under Philippines law, this defense goes to the entire contract as a whole and not to the arbitration clause exclusively. Therefore, under the *Prima Paint* doctrine, this would be a matter for the arbitration panel to consider.[3]

---

**3.** Nor is the plaintiffs' reliance on the doctrine of "adverse domination" persuasive. First, I have concluded that Marcos had authority over the NPC under Philippine law as it existed at the time, and that his control was not, as plaintiffs' invocation of this doctrine suggests, illegitimate. Second, I note that this equitable doctrine tolls the statute of limitations for a corporation's claims against its officers and directors when those in control of the corporation cannot be expected to pursue claims that would result in their undoing. *E.g., IIT v. Cornfeld,* 619 F.2d 909, 929–30 (2d Cir.1980). Even if this doctrine were analogized to the present situation, a statute of limitations problem is not presented here, plaintiffs have not joined Marcos in this action and it appears that Marcos would be (and, in fact has been) susceptible to suit on a variety of theories related to his acceptance of bribes and

conversion of government assets. *See, e.g., Republic of the Philippines v. Marcos,* 862 F.2d 1355 (9th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989); *Republic of the Philippines v. Marcos,* 806 F.2d 344 (2d Cir.1986), *cert. dismissed,* 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987).

Finally, plaintiffs argue that the opinions in the two previously-cited cases between the current Philippine government and Marcos compel a conclusion in this case that Marcos did not possess, in the words of the Ninth Circuit, "the authority of an absolute autocrat" and that he was "bound by the laws that applied to him." 862 F.2d at 1361. First, the Ninth Circuit's conclusions and the Second Circuit's consideration of similar issues in another case against Marcos were made in the context of the act of

In conclusion, plaintiffs' allegations of bribery, even if true, do not make the contract void or voidable since the recipient of the payments, Marcos, had the authority to compel NPC to contract with Westinghouse.

### III. Which Counts are Arbitrable

This leaves the question of which counts are subject to arbitration.

The Supreme Court has stated that the Arbitration Act expresses a " 'liberal federal policy favoring arbitration agreements.' " *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 624–28, 105 S.Ct. 3346, 3352–55, 87 L.Ed.2d 444 (1985) quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). This federal policy "applies with special force in the field of international commerce." *Mitsubishi*, 473 U.S. at 631, 105 S.Ct. at 3356; *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 44 (3d Cir.1978).

In accord with this policy, arbitration clauses are interpreted broadly; " 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' " *Mitsubishi*, 473 U.S. at 626, 105 S.Ct. at 3353. "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Id.* Thus as the Third Circuit has observed,

> any 'doubts as to whether an arbitration clause may be interpreted to cover the asserted dispute should be resolved in favor of arbitration unless a court can state with 'positive assurance' that this dispute was not meant to be arbitrated.'

*Becker*, 585 F.2d at 44 quoting *Hussey Metal Division v. Lectromelt Furnace Division*, 471 F.2d 556, 558 (3d Cir.1972) (quoting, in turn, *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347,

1352–53, 4 L.Ed.2d 1409 (1960)). The test for whether a given matter is arbitrable has been alternatively formulated as whether the factual allegations underlying the action "touch matters covered" by the arbitration clause. *Mitsubishi*, 473 U.S. at 624 n. 13, 105 S.Ct. at 3352 n. 13.

### A. Plaintiffs' Claims against Westinghouse

■ The PNPP contract contains a broad arbitration clause which states, in pertinent part:

> The parties shall exert their best efforts to arrive at an amicable settlement of *any dispute which may arise between them with respect to this contract.* If, however, no such settlement is reached, then upon written notice from either Party to the other Party, said dispute shall be finally settled by arbitration under the Rules of Conciliation and Arbitration of the International Chamber of Commerce.

PNPP Contract, Article 24 (emphasis supplied).

Applying the precepts reviewed above, it is clear that well nigh all of the plaintiffs' counts against Westinghouse are covered by the arbitration clause and must therefore be stayed pending the outcome of that proceeding. Count 6, NPC's claim for breach of the PNPP contract, is, of course, clearly within the ambit of the arbitration clause. Further, since plaintiffs' negligence count, Count 7, and plaintiffs' fraud count, Count 4 (to the extent that it alleges fraud in the execution of the contract) are founded on the same factual allegations underlying the claim for breach of contract, they too are subject to arbitration. *E.g., Schattner v. Girard, Inc.*, 668 F.2d 1366, 1369 (D.C.Cir.1981); *Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614, 616 (1st Cir.1975).

■ *Prima Paint* teaches that claims that go to the validity of the contract as a

---

state doctrine. The position that Marcos' acts are subject to legal review in the courts of the United States is not inconsistent with the conclusion regarding the legal scope of Marcos' power in the present situation. The conclusion that Marcos had authority over the NPC in this instance does not mean that his powers, although exceptionally broad, were without bounds or unreviewable. The Republic may well have a claim against Marcos for his alleged receipt of payments related to the PNPP contract.

whole, such as coercion, duress, illegality and fraud in the inducement, are embraced within the reach of a broad arbitration clause and must be arbitrated. *Prima Paint,* 388 U.S. at 402–03, 87 S.Ct. at 1805–06. Count 1, plaintiffs' claim for rescission based on "fraudulent, illegal and improper conduct" in the procurement of the contract is therefore subject to arbitration. Count 4, a common-law fraud count, to the extent that it alleges fraud in the inducement of the contract, is also subject to arbitration under this same reasoning.

■ Count 8, for civil conspiracy, presents similar issues. To the extent that the count alleges conspiracy to commit both fraud in the inducement and common-law fraud, it must be stayed for the reasons discussed with reference to Counts 1 and 4 above. The additional allegation that defendants conspired to conceal these acts is intimately related to the other allegations and must be stayed for similar reasons. Count 8's allegation that defendants overcharged NPC for work not done or improperly done is simply a recasting of Count 6, for breach of contract, and, since the latter is clearly governed by the arbitration clause, the former must also be stayed.

■ Although it was until recently an open question whether claims under the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. sections 1961–68, were arbitrable, this issue was recently resolved by the Supreme Court. In *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987), the Court declared that " 'we are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals' should inhibit enforcement of the Act 'in controversies based on statutes,' " *id.* 482 U.S. at 226, 107 S.Ct. at 2337 quoting *Mitsubishi,* 473 U.S. at 627, 105 S.Ct. at 3354 quoting *Wilko v. Swan,* 346 U.S. 427, 432, 74 S.Ct. 182, 185, 98 L.Ed. 168 (1953), *overruled,* — U.S. ——, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Thus "to defeat application of the Arbitration Act," it must be shown that "Congress intended to make an exception to the Arbitration Act under RICO." *Id.,* 482 U.S. at 227, 107 S.Ct. at 2338. Since the Court concluded that there was "no inherent conflict" between arbitration and the purposes of the RICO statute and since "nothing in RICO's text or legislative history otherwise demonstrates congressional intent to make an exception to the Arbitration Act," it ruled that RICO claims are arbitrable. *Id.* at 242, 107 S.Ct. at 2346. Plaintiffs' Counts 9, 10 and 11, are therefore arbitrable. Since New Jersey's "little RICO" Act, N.J.S.A. sections 2C:41–1 through 2C:41–6.2, is virtually identical to its federal forebear and since there is apparently no legislative history to indicate that it drafters considered arbitration inimical to its purposes, there is no reason why plaintiffs' claims under this statute as well, made in Counts 12, 13 and 14, should not be subject to arbitration.

■ The claims brought under the Robinson–Patman Act are also arbitrable. In *Mitsubishi,* the Supreme Court considered whether an international dispute involving claims brought under the Robinson–Patman Act was arbitrable. The court held that, at least in the context of an international dispute, an arbitration clause was a sophisticated choice-of-law provision that also set out the procedure by which the dispute is to be resolved. 473 U.S. at 631, 105 S.Ct. at 3356. The Court also ruled that arbitration of antitrust claims was not inimical to the purposes of the antitrust laws. *Id.* at 632–40, 105 S.Ct. at 3356–61. Plaintiffs' Count 15, alleging that bribes were paid in contravention of the Robinson–Patman Act, 15 U.S.C. sec. 13(c), relates to the factual allegations regarding the procurement of the contract and is arbitrable.

■ The logic of *Shearson* and *Mitsubishi* should also be applied to plaintiffs' statutory claims under the New Jersey Consumer Fraud Act, N.J.S.A. sections 56:8–1 through 56:8–48, plaintiff's Count 5. There is no evidence that the legislature intended to foreclose the resolution of

claims brought under that Act through arbitration and this count is also arbitrable.

This leaves remaining only Count 3, the claim made by the Republic against both defendants for tortious interference with the fiduciary duties owed by President Marcos to the Philippine people, and Count 8, to the extent that the latter sets out a claim for conspiracy to interfere with fiduciary duties owed to the Philippine people and NPC. The Republic is not a party to the PNPP contract and therefore not bound directly by the arbitration clause. However, even if the Republic were bound by the terms of the arbitration clause, as Westinghouse argues, as either a third-party beneficiary, as an assignee, or on an alter ego theory, its provisions do not comprehend the breach of fiduciary duty claims set out in Counts 3 and 8.

As the discussions above reflect, the PNPP contract's broad arbitration clause comprehends any type of claim made under or relating to work of the contract. The terms of the clause cannot be subverted merely by recasting as torts what would otherwise be contract claims. Hence Count 7, NPC's claim for negligence arising out of work performed by defendants pursuant to the contract, must be governed by the arbitration clause.

The breach of fiduciary duty counts, in contrast, relate to bribes that were allegedly paid to Marcos in order to induce him to intervene in the PNPP contracting process on behalf of defendants in derogation of the rights and interests of the Philippine people in a fair and open bidding process. To the extent these allegations may be found to set forth a viable claim, they present allegations that are not related to the performance of the contract itself and go beyond simple fraud in the inducement. These allegations claim that defendants subverted a separate, preexisting duty owed by Marcos to the Philippine people. It can thus fairly be said that both the factual allegations and the legal theories underlying these claims are separate and distinct from claims relating to work performed under the PNPP contract itself or to claims alleging fraud in the inducement

or execution of the PNPP contract which would be governed by the arbitration clause. Count 3 and Count 8, to the extent the latter sets out a claim for conspiracy to interfere with fiduciary duties, will therefore be permitted to proceed against Westinghouse. The other counts against Westinghouse will be stayed pending completion of arbitration.

## B. Claims against Burns & Roe

The only claim against Burns & Roe governed directly by an arbitration agreement is Count 2, for rescission of the consulting agreement Burns & Roe entered into with NPC before it received the A/E subcontract. The consulting agreement contained the following arbitration clause:

> Any dispute or difference arising out of this Contract or in connection therewith which cannot be amicably settled between the parties shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules. The arbitration shall take place in Geneva, Switzerland. The resulting award shall be final and binding on the parties and shall be in lieu of any other remedy....

NPC Consulting Contract, Article VI, para. 12(a), Supplemental Affidavit of Samuel P. Hull, Jr. dated Nov. 28, 1988, Exhibit 18 at pp. 3–4.

Plaintiffs concede that they are unable to present evidence which links this clause to payments made to Marcos. Even if they were able to demonstrate that payments were made, however, these payments would not vitiate the arbitration clause for the reasons discussed above in Section II. Since Count 2 seeks rescission of this consulting agreement it is evident that this claim is encompassed within the scope of the arbitration clause.

The complaint asserts a number of other counts against Burns & Roe, for tortious interference with President Marcos' fiduciary duties (Count 3), common law fraud (Count 4), violations of the New Jersey Consumer Fraud Act (Count 5), civil con-

spiracy (Count 8), violations of the federal RICO statute (Counts 9 through 11), violations of the New Jersey "little RICO" statute (Counts 12 through 14) and violations of the Robinson–Patman Act (Count 15). These counts generally allege a tortious course of conduct involving the procurement of the consulting and A/E contracts and the design and construction of the plant itself.

Burns & Roe claims first that all of the claims lodged against it must be arbitrated because they are governed by the arbitration clause in its consulting contract. It attempts to bring the various claims of the complaint within the orbit of that clause by arguing that each of the claims recounts a fraudulent course of conduct that allegedly began with the consulting contract and that therefore each claim arose out of or in connection with that contract and is governed by its terms including the arbitration clause.

This argument proves too much, however. Burns and Roe did very little work on the consulting contract. Soon after obtaining that contract it learned that it would receive the far more substantial A/E subcontract for the PNPP project and withdrew from its role as consultant. The claims in question relate, on the one hand, to factual allegations that occurred before the consulting contract was entered into—allegations regarding the method of its procurement, for example—and, on the other hand, to allegations that went on for years after that contract was terminated—allegations regarding Burns and Roe's performance on the PNPP project itself. It is not a mechanistic application of the "touch test" that controls whether a given claim is subject to an arbitration clause but whether it can be fairly said that the parties intended to arbitrate a claim. Here it cannot be said that the NPC and Burns & Roe intended to arbitrate a whole host of claims related to activities that preceded and followed the consulting contract and were only indirectly related to its subject matter.

■ Burns & Roe also attempts to rely upon the arbitration clause in the PNPP prime contract as a basis for arbitrating these claims. Although it was not a party to that contract, Burns & Roe argues that the arbitration clause which gives any subcontractor the "full opportunity to present its views and be heard by the arbitrators" in any arbitration proceeding which may "affect" it requires a stay of the proceedings against it here.

As a matter of law, Burns & Roe's position is not tenable. Separate contracts between the client, the contractor and the subcontractor raise the possibility that there will be different terms and it is not inequitable to require the subcontractor to litigate while the contractor must arbitrate. Nor does the PNPP arbitration clause giving Burns & Roe the "opportunity" to participate in arbitration proceedings that affect it give rise to the inference that any claims against Burns & Roe must be arbitrated.

■ However, there are other sound reasons for staying the claims against Burns & Roe. The court has inherent power to control its docket in order to conserve judicial resources. *Cost Bros., Inc. v. Travelers Indemnity Co.*, 760 F.2d 58, 60 (3d Cir.1985); *Bechtel Corp. v. Local 215, Laborers' Int'l Union*, 544 F.2d 1207, 1213 (3d Cir.1976). Since similar claims against Westinghouse are to be arbitrated and since Burns & Roe will have an opportunity to participate in those proceedings, the efficient and equitable solution would be to stay the present litigation against Burns & Roe with the expectation that many of the central issues that bear on this litigation will be resolved or advanced through arbitration.

Since as discussed above, however, Count 3, alleging a claim for tortious interference with fiduciary duties, and Count 8, to the extent that it sets forth a claim for conspiracy to interefere with fiduciary duties, will not be stayed against Westinghouse and since these claims, in any case, present a discrete subset of issues, they will also be permitted to proceed against Burns & Roe.

## IV. Conclusion

For the reasons discussed above, I conclude as follows. With the exception of

Count 3 and that part of Count 8 that sets out a similar claim for conspiracy, all counts against Westinghouse are stayed under section 3 of the Federal Arbitration Act pending arbitration pursuant to Article 24 of the PNPP prime contract. Count 2 against Burns & Roe will also be stayed under section 3 of the FAA pending arbitration in accord with the terms of the NPC consulting contract. With the exception of Count 3 and Count 8, to the extent that the latter sets out a claim for interference with fiduciary duties, all other claims against Burns & Roe will, in the interests of judicial economy, be stayed pending resolution of the arbitration proceedings involving Westinghouse. Count 3 and the related portion of Count 8 will be permitted to proceed in this forum against both Westinghouse and Burns & Roe. Westinghouse should submit an appropriate form of order.