The **REPUBLIC OF the PHILIPPINES and National Power Corporation,** Plaintiffs,

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Westinghouse International Projects Company and Burns and Roe Enterprises, Inc.,** Defendants.

Civ. No. 88–5150.

United States District Court, D. New Jersey.

Feb. 4, 1992.

---

Paul A. Rowe, Alan S. Naar, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, N.J., and Mark Augenblick, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for Republic of the Philippines.

Raymond M. Tierney, Jr., William D. Sanders, Shanley & Fisher, Morristown, N.J., and David Boies, Richard W. Clary, Cravath, Swaine & Moore, New York City, and Jonathan D. Schiller, Randall L. Speck, Donovan Leisure, Rogovin, Huge & Schiller, Washington, D.C., for Westinghouse Elec. Corp. and Westinghouse Intern. Projects Co.

George W.C. McCarter, Jr., McCarter & English, Newark, N.J., and Glenn A. Mitchell, David U. Fierst, Stein, Mitchell & Mezines, Washington, D.C., for Burns and Roe Enterprises, Inc.

## OPINION

DEBEVOISE, District Judge.

The Republic of the Philippines (the "Republic") and the National Power Corporation ("NPC") instituted this action against Westinghouse Electric Corporation and Westinghouse International Projects Com-

pany (collectively, "Westinghouse") and Burns & Roe Enterprises, Inc. ("Burns & Roe"), asserting multiple tort and contract claims. The case arises out of the construction of the 600–megawatt Philippine Nuclear Power Plant ("PNPP") in Bagac, Bataan during a ten year period commencing in 1976.

I concluded that with the exception of Count 3 and part of Count 8 all counts against Westinghouse should be stayed and referred to arbitration, that Count 2 against Burns & Roe should be stayed and referred to arbitration and that with the exception of Count 3 and part of Count 8 all the remaining counts against Burns & Roe should be stayed pending the completion of arbitration. Count 3, which alleges that Westinghouse and Burns & Roe breached their fiduciary duties to the Philippine people by bribing former Philippine President Ferdinand Marcos in connection with the PNPP contracts, and the portion of Count 8 which alleged a conspiracy to bribe President Marcos, were permitted to proceed in this Court. *See Republic of the Philippines v. Westinghouse, et al.,* 714 F.Supp. 1362 (D.N.J.1989) (the "Stay Opinion").

Those two proceedings went forward in parallel. In this Court the Count 3 and Count 8 conspiracy claims were litigated through discovery and many motions to the point of trial. In Geneva, three arbitrators pursued their task.

On December 19, 1991, the Arbitrational Tribunal (the "Tribunal") rendered a "Preliminary Award on Issues of Jurisdiction and Contract Validity" (the "Arbitration Award" or the "Award"). *See* Clary Affidavit at Exhibit A. The Award addresses the questions of arbitral jurisdiction and the validity of the prime contract between Westinghouse and the NPC for construction of the PNPP and the consulting contract between Burns & Roe and the NPC for engineering and consulting services. It concluded that the contracts (and the arbitration clauses in them) are valid and that they confer arbitral jurisdiction over the NPC. *See infra* "The Award."

Based on the Award, and more particularly on the Tribunal's findings on the existence of bribery by Westinghouse and Burns & Roe, the defendants have moved for summary judgment, on the theory of collateral estoppel, with respect to Counts 3 (tortious interference with fiduciary duty) and 8 (conspiracy to interfere with fiduciary duty) of this lawsuit. A trial is tentatively scheduled to begin during the third week of February, 1992.

A preliminary comment is in order with respect to what is not the subject matter of the defendants' summary judgment motions. Westinghouse has argued that the issue presented is whether a court may give collateral estoppel effect to an arbitration proceeding. *See* Transcript of Hearing, January 24, 1992, at 4, 19 ("Transcript").[1] All parties have cited my prior decision in *Glictronix Corp. v. American Tel. & Tel. Co.,* 603 F.Supp. 552 (D.N.J. 1984) in support of their various contentions.[2] Because nothing in *Glictronix*

---

1. Later, Westinghouse framed the issue presented as whether a "sufficient relationship" exists between the Republic and the NPC to estop the Republic from litigating the fiduciary duty and conspiracy claims in this Court. Transcript at 35.

2. *Glictronix* was an antitrust action alleging violations of the Sherman Act, 15 U.S.C. § 1 and 2. *Id.* at 556. In support of its motion for partial summary judgment and based on jury findings and the Second Circuit's opinion in *Litton Systems, Inc. v. American Tel. & Tel. Co.,* 91 F.R.D. 574 (S.D.N.Y.1981) *aff'd* 700 F.2d 785 (2d Cir. 1983) *cert. denied* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984), Glictronix (the plaintiff) sought to preclude the defendants from relitigating certain antitrust issues. *Glictronix,* 603

F.Supp. at 559. In *Litton* a different plaintiff alleging the same antitrust violations with respect to the same product had brought suit against the *Glictronix* defendants and other affiliated AT & T companies. *Id.* (citations omitted). By the time of the *Glictronix* case *Litton* had also constituted the basis for yet another federal lawsuit where a separate plaintiff had sought to collaterally estop the defendants from relitigating certain issues. *Id.* (citation omitted). I ruled that the defendant was not precluded under the non-mutual offensive application of the collateral estoppel doctrine from relitigating the issues which had been determined adversely to it in the previous action. In so ruling I set forth and applied the controlling law on this issue in the Third Circuit. *See id.* at 563–64.

would preclude the application of collateral estoppel to an arbitration proceeding, I believe Westinghouse has mischaracterized the issue before the Court. *See* Transcript at 4 (collateral estoppel effect of an arbitration proceeding). Rather, the issue presented is whether, under the circumstances, the Tribunal's decision should bind the Republic on a collateral estoppel theory. *See* Transcript at 13–14.

I am ruling that the Republic is not bound, and, therefore, am denying the defendants' motions. I do so for three reasons: (i) there is insufficient identity between the issues decided by the Tribunal and Counts 3 and 8; (ii) the Tribunal applied a more onerous standard of proof than a jury to the extent the contract validity and arbitral jurisdiction bribery issue and Counts 3 and 8 bribery issue overlap; and, (iii) the Republic is in any event not bound by the Tribunal's ruling because it is not a party to the arbitration. I am rejecting the Republic's contentions that collateral estoppel is barred by the discovery of new evidence subsequent to the Third Circuit's ruling of December 19, 1991, 951 F.2d 1414, in the form of the documentation provided to the Department of Justice or by the failure of the Tribunal to consider certain evidence of record. *See Westinghouse v. Republic of the Philippines,* 951 F.2d 1414 (3d Cir.1991). I also find it unnecessary to consider the other elements of collateral estoppel. *See Temple University v. White,* 941 F.2d 201, 212 (3d Cir.1991) *cert. denied* —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992) (setting forth the elements of collateral estoppel); *Lane v. Sullivan,* 900 F.2d 1247, 1250 (8th Cir.) *cert. denied* —— U.S. ——, 111 S.Ct. 134, 112 L.Ed.2d 101 (1990).

## THE AWARD

I will first review the relevant portions of the Arbitration Award. The Tribunal set forth, and answered in the negative, the six issues covered by the Award as follows: i) was the arbitration clause relied upon by Burns & Roe obtained in such a manner as to render it invalid; ii) if (i) is answered in the negative, is the Republic bound by the said arbitration clause; iii) was the arbitration clause relied upon by Westinghouse obtained in such a manner as to render it invalid; iv) if (iii) is answered in the negative, is the Republic bound by such arbitration clause; v) was the engineering and consulting services contract between NPC and Burns & Roe dated April 23, 1974 obtained in such a manner as to render it invalid, and; vi) was the contract dated February 9, 1976 between NPC and Westinghouse Electric S.A. for Philippine Nuclear Power Plant ("PNPP") Unit 1 obtained in such a manner as to render it invalid. Award at 5.

The Award reviewed the basic facts giving rise to the disputes between the parties. They are essentially the same facts set forth in my Opinion of September 20, 1991, and various of my other opinions, which I incorporate by reference. *See generally Republic of the Philippines v. Westinghouse,* 139 F.R.D. 50 (D.N.J.1991) (the "Damages Opinion"); *Republic of the Philippines v. Westinghouse,* 774 F.Supp. 1438 (D.N.J.1991) (the "Summary Judgment Opinion"); the Stay Opinion, 714 F.Supp. at 1362. The Award then addressed several preliminary issues and determined the applicable law. Award at 16–30.

### 1. Standard of Proof

The Tribunal discussed the various formulations of the "preponderance of the evidence" and "clear and convincing evidence" standards and concluded that the standard to be applied in weighing the evidence was the "preponderance of the evidence standard" as generally understood in the Philippines, New Jersey and Pennsylvania. Award at 30–34. The Tribunal also concluded that it would apply a "clear and convincing evidence" standard to the defendants'[3] claims of bribery, Award at 35, and that it would apply an undefined "higher

---

**3.** The plaintiffs in the within action were the defendants in the arbitration for purposes of the Preliminary Award. The NPC remains the defendant in the arbitration. *See* Award at 130 (*Order*).

burden of proof" should the Republic and NPC seek to prove the existence of bribery in a certain way. *See infra* The Award, Section 2 at 8; Award at 41–42.

Its discussion of the differences between the two standards of proof notwithstanding, the Tribunal specified:

> Under the facts of this case, however, this difference in standard of proof is of no moment. Whether the standard applied is the general civil standard of "more likely true than not true:—or, as put by Defendants' [the Republic and NPC's] lead counsel, "Does the evidence tested against human experience and common sense persuade or does it not?"—or the higher standard of "clear and convincing evidence," the Tribunal's findings would be the same. Award at 35.

### 2. Validity of the Contracts and the Arbitration Clause

The Tribunal next addressed the validity of the arbitration clauses of the two contracts, noting that the arbitration clause of each was being challenged by the Republic and the NPC on the grounds that it was procured by bribery. Award at 36. The Tribunal noted that the Westinghouse contract was being challenged on the additional grounds that the NPC was forced to accept the contract through bribe-induced pressure from President Marcos. Award at 36.[4]

With respect to the applicable definition of bribery, the Tribunal held that bribery could be established either by proof that President Marcos received a payment, Award at 41, or by proof, by "clear and convincing evidence," that:

> (i) the alleged briber intended to provide a payment or another thing of value to President Marcos and;
>
> (ii) that President Marcos agreed to accept that consideration, either directly, or through [Herminio] Disini, in exchange for his directing that NPC enter into the

challenged contract with the briber. Award at 41.

Under this definition the Republic and NPC were not required to show that consideration was actually received by President Marcos. If no showing of actual receipt of consideration were made, however, the Republic and NPC were required to prove the existence of an actual agreement. Award at 41. This was because "evidence of payments would imply the existence of an agreement; in the absence of such evidence, there must be additional proof that there was an agreement." Award at 41. To this method of proof of bribery, of which the Republic and NPC might avail themselves if unable to prove actual payments, the Tribunal would apply a burden of proof "higher" than clear and convincing evidence. Award at 41–42.

The Tribunal reviewed the evidence offered to establish that Burns & Roe intended to provide a payment to President Marcos or that President Marcos agreed to accept payments through Disini in exchange for his directing NPC to enter into the contract with Burns & Roe. Award at 42–57. The evidence established that sometime around February 6, 1974—one week prior to his first contact with Burns & Roe—Disini sent an aide-memoire to President Marcos recommending Burns & Roe and that prior to that date President Marcos directed that Burns & Roe receive the contract. Award at 47. In other words, Disini and President Marcos took steps supporting Burns & Roe for reasons independent of any contact or agreement with Burns & Roe. *See* Award at 52. The Tribunal found no evidence of any contact between Burns & Roe and Disini and President Marcos prior to February 13, 1974.

The Tribunal then reviewed the evidence offered to establish that the Westinghouse contract was obtained by bribery. Award at 57–79. Westinghouse entered into a Special Service Representative ("SSR") arrangement with the corporation of which Disini was Chief Executive Officer, Herdis

---

**4.** The NPC and the Republic also relied on the provisions of the Philippine Anti–Graft and Corrupt Practices Act to void the two contracts. I am omitting the Tribunal's discussion of this topic from this review. *See generally,* Award at 37, 85–94.

Management and Investment Corporation ("Herdis"). Award at 57–59. Since no proof of direct payments to President Marcos existed, President Marcos' interest in Herdis was critically important to a showing that he was receiving the SSR payments.

Among the categories of evidence which the Tribunal analyzed were: meetings and communications between Disini and Westinghouse personnel, Award at 59–60; memoranda concerning March 1974 meetings among Westinghouse officials in San Francisco which immediately preceded the March 15 execution of the SSR contract, Award at 60–64; an April 10, 1975 aide-memoire from Disini to President Marcos, Award at 66–67; the so-called "Hawaii documents," Award at 67–68; documents created or events occurring after the PNPP contract was signed, Award at 68–69; the reaction of Disini and Westinghouse to press allegations of impropriety in the contract negotiations, Award at 69–70; data suggesting that President Marcos owned a Liechtenstein entity called Limousine Anstalt, Award at 72–74, and; testimony of Jesus Disini, Award at 74–75.

Insofar as Herdis is concerned, the Tribunal concluded that the Westinghouse commissions were paid to Herdis, but that there was no indication that the commissions were disbursed to any entity in which President Marcos had an interest.

The Tribunal's ultimate conclusion with respect to the Westinghouse construction contract was that there existed a fair amount of evidence that Westinghouse intended to provide payments to President Marcos, Award at 76, but that the evidence failed to prove that President Marcos promoted Westinghouse because he expected to receive some of the SSR payments from Herdis. Award at 78. The Tribunal concluded that there was no evidence of any agreement between President Marcos and Westinghouse or that Disini acted as agent for President Marcos or shared any commissions with him. Award at 77, 79. Thus, the Tribunal found that NPC and the Republic failed to carry their burden of proving Westinghouse's alleged bribery. Award at 79.

Just as it reviewed the evidence bearing on the procurement of the contract as a whole, the Tribunal reviewed the evidence bearing on the negotiation of the arbitration clause of the Westinghouse contract. Award at 79–85. It found nothing unusual in connection with the negotiation of the arbitration clause, Award at 80–85, and found no evidence of pressure specifically directed to the arbitration clause or any discussion of that clause by Disini or others with President Marcos. Award at 85. Thus, the Tribunal concluded that the defendants had not established that the arbitration clause was obtained through bribery of President Marcos. Award at 85.

*3. Jurisdiction over the Republic*

Next, the Tribunal addressed the issue of jurisdiction over the Republic. Award at 95–122. It first noted that the Republic was not a party to either of the contracts that it had just found to be valid. Award at 95. Applying Philippine law, it then rejected the four arguments advanced to justify binding the Philippines to those provisions, all of which are grounded in the relationship between the Republic and the NPC before this lawsuit commenced: (i) that the NPC was the alter ego of the Republic. Award at 97–104; (ii) that the NPC was the agent of the Republic, Award at 105–106; (iii) that the Republic was a third party beneficiary of the contracts, Award at 106–107, and; (iv) that the Westinghouse construction contract was assigned by the NPC to the Republic, Award at 108–11.

The Tribunal raised the question whether the Republic is a guarantor of any potential award against NPC and, if so, whether it should be a party to the arbitration in its role as guarantor. Award at 111–13. The Tribunal noted that the Republic had not exercised, and in fact declined, its right as a guarantor under Philippine law to intervene in the arbitration proceeding. Award at 113.

Finally, the Tribunal addressed the contention of Westinghouse and Burns & Roe

that the Republic should be bound because they would be forced to relitigate in this Court all the claims asserted by the NPC in the arbitration. *See* Award at 95, 144–22 (Effect of the Existence of the New Jersey Litigation). It ruled that this argument is largely irrelevant to the question of the jurisdiction of the Tribunal, "having limited bearing only on the alter ego issue." Award at 114.

The Tribunal noted that Westinghouse filed the request for arbitration on December 1, 1988, and that Westinghouse and Burns & Roe filed the motion to stay this action pending arbitration on the same day. Award at 115–16. It then summarized the Complaint, noting that "[i]n general, the facts alleged in the Complaint concern the same contracts, charges of bribery and other events that have been the subject matter of evidence presented to this Tribunal." Award at 116. Referring to my opinions (the Stay and Summary Judgment Opinions), the Tribunal noted my statements while allowing Counts 3 and 8 to go forward that the "Republic is not a party to the PNPP contract and therefore [is] not bound directly by the arbitration clause," and that "it cannot be said that the NPC and Burns & Roe intended to arbitrate a whole host of claims related to activities that preceded and followed the consulting contract and were only indirectly related to its subject matter." Award at 116; 714 F.Supp. at 1374–75. *See also* Award at 119 (statement of the trial judge that the Republic was not bound by the arbitration clause and that clause was not meant to be all encompassing with respect to NPC–Burns & Roe).

The arbitrators concluded that "[t]his Tribunal has no doubt that the trial judge will not alter his ... decision and permit any additional counts to be litigated ... as a result of a finding by the Tribunal that the Republic is not a party to the PNPP arbitration clause." Award at 120. This conclusion was premised on what the arbitrators considered to be my appropriate reference to the general policies of United States courts favoring arbitration. *See* Award at 120. The Tribunal also noted that "the trial judge proceeded on the

premise that the Republic is not bound by the arbitration and specifically found that Burns & Roe is not a party to any arbitration clause with respect to the claims alleged by the Republic and the NPC[,]" and that it is "very unlikely that the Court will ... lift its stay, thus allowing the Republic to litigate claims that will be arbitrated here by NPC." Award at 120–21.

The Tribunal reiterated that "the Tribunal has found that the Court correctly assumed that the Republic is not bound by the arbitration clause," Award at 121, stated that I anticipated the possibility that the Republic would not have a forum to litigate the stayed issues, Award at 121 n. 37, and stated that my Damages Opinion reinforces the Tribunal's conclusion to the extent it held that Counts 3 and 8 could go forward with damages limited to the amount of the alleged bribes without " 'render[ing] nugatory the work of the arbitrators.' " Award at 122; Damages Opinion at 4–5.

The Tribunal concluded that the existence of the possibility of duplicative litigation in New Jersey "has no effect on whether the Republic is subject to the arbitration clause." Award at 122. An award of costs to the Republic was appropriate because it had prevailed on the issue of jurisdiction and was no longer a party to the arbitration. This was so even though the same lawyers represented the Republic and the NPC and would continue to represent the NPC in the arbitration. Award at 127. The Award ordered that:

> The Republic of the Philippines is not bound by either of the above-mentioned arbitration clauses and is therefore no longer a party to this Arbitration. Award at 130.

## DISCUSSION

### 1. *Bribery and Counts 3 and 8*

■ One of the basic requirements of collateral estoppel is that "the issues as to which a party seeks preclusion must be 'identical' or 'in substance the same' as the issues determined in the prior litigation." *Glictronix,* 603 F.Supp. at 564 (quoting *Montana v. United States,* 440 U.S. 147,

155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979)). *See also Kauffman v. Moss,* 420 F.2d 1270, 1274 (3d Cir.1970) *cert. denied* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970) ("[r]easonable doubt as to what was decided by a prior [criminal] judgment should be resolved against using it as an estoppel [in a later civil action]"); *Gregory v. Chehi,* 843 F.2d 111, 121 (3d Cir.1988) (contrasting issue and claim preclusion and extending *Kauffman*'s "reasonable doubt" statement to the estoppel effect in civil actions of prior civil judgments). Westinghouse and Burns & Roe argue that the Republic's claims for tortious interference, conspiracy and damages are "precisely the same" as those which have been decided by the Tribunal," and move for summary judgment on Counts 3 and 8 in their entirety. *See* Westinghouse Brief at 1, 32.[5]

██ It is ineluctable, as counsel for the Republic has stated and as Westinghouse has noted, that "the fact of bribery, indeed the amount of the bribes, has always been relevant both to Count 3 and 8 and to the counts in the arbitration." *See* Westinghouse Reply Brief at 13 (citing statement of the Republic at October 28, 1991 Hearing, at 20). This relationship is amply established by the various statements of the parties and of mine, to which the defendants have gone to great lengths to draw my attention. It is also clear that much of the evidence presented to the arbitrators on their jurisdictional question would also be presented in connection with a trial of Counts 3 and 8. *See* Clary Aff., Exs. I, J and K; Pretrial Order at 100–11, 115–42, 183–298, 430–616, 819, 1097 and 1101. This is hardly to say that issues presented are "precisely the same" or that the Tribunal's findings on bribery otherwise preclude trial of the fiduciary duty and conspiracy counts. *See supra* note 5; Westinghouse Brief at 32.

When I stayed the Complaint with the exception of Counts 3 and 8 on May 18, 1989 I noted that the fiduciary duty and conspiracy counts were grounded in the alleged "derogation of the rights and interests of the Philippine people [under Philippine law] in a fair and open bidding process." 714 F.Supp. at 1374. These claims "went beyond simple fraud in the inducement ... [claiming] that [the defendants] subverted a separate, preexisting duty owned by Marcos to the Philippine people." *Id.* I concluded with respect to the claims against Westinghouse that:

> [i]t can thus fairly be said that both the *factual allegations and the legal theories* underlying these claims are separate and distinct from claims relating to work performed under the PNPP contract itself or to claims alleging fraud in the inducement or execution of the PNPP contract which would be governed by the arbitration clause. *Id.* (emphasis added).

Regarding the claims against Burns & Roe, I did not stay Counts 3 and 8 because they were not stayed against Westinghouse and because these claims "present a discrete subset of issues." *Id.* at 1375. I also noted that in its attempt to bring all the claims against it within the ambit of the arbitration clause of the consulting contract, Burns & Roe had "prove[n] too much," because it could not be said that Burns & Roe intended to arbitrate "a whole host of claims related to activities that *preceded* and *followed* the consulting contract and were only indirectly related to its subject matter [including those that allegedly went on for years after the award of the consulting contract in connection with the A/E subcontract]." *Id.* (emphasis added).

My consideration of the defendants' last summary judgement motions also strongly

5. Westinghouse also suggests—while inaccurately accusing the Republic of confusing issue and claim preclusion—that the bribery issue in the arbitration and Counts 3 and 8 are not "precisely the same," but that the Tribunal's findings on the former nevertheless preclude a jury trial of the latter because the "unproven 'fact' [bribery] cannot support a legal claim of tortious interference any more than it could support a legal claim of contract invalidity." Westinghouse Reply Brief at 13–14. The defendants' claim under either theory—if they are different—fails for the same reasons, as discussed fully below; the factual allegations and legal theories of the fiduciary duty counts and the arbitral bribery issue are separate and distinct. *See* 714 F.Supp. at 1374.

supports a separation of the claims for tortious interference with fiduciary duty and conspiracy, and the arbitral claims concerning jurisdiction and validity of the contracts. *See* 774 F.Supp. at 1466 ("[F]or purposes of Counts 3 and 8 of the Republic's complaint, the legality of the PNPP contract is simply not at issue. . . ."). And in limiting damages, I also emphasized the fundamental difference between the issues in arbitration and the issues in Counts 3 and 8. *See* Damages Opinion at 8–10.[6]

It is beyond dispute, therefore, that I have at all times considered both the factual allegations and legal theories of Counts 3 and 8 to be distinct from the arbitral counts which concern bribery. Moreover, it is clear upon comparison of the issues which constitute Counts 3 and 8 and the arbitral bribery findings that a far broader range of misconduct by Westinghouse and Burns & Roe would justify recovery under Counts 3 and 8. Collateral estoppel thus cannot be applied properly.

The distinction is best illustrated by the Tribunal's treatment of the Burns & Roe consulting contract, where it decided the contract was valid because President Marcos directed the award to Burns & Roe before the payment of the commissions, but did not consider relevant to contract validity and jurisdiction any payments through Disini after the award. Award at 54. The acceptance of such payments from a contractor in connection with a construction project is plainly a violation of President Marcos' fiduciary duty to the Philippine people.

Also, the Tribunal in no way, shape or form addressed the award of the A/E subcontract whereas I have held that there is sufficient evidence for a jury to conclude upon consideration of Counts 3 and 8 that President Marcos was bribed to make sure Burns & Roe received the A/E subcontract. *See* 774 F.Supp. at 1446. *See also* Transcript at 8 (fiduciary duty counts include the award of "some [sic] contracts").

Because the Tribunal considered whether the contracts were rendered invalid as a result of the manner in which the defendants obtained them, they also did not give the same consideration as a jury might to whether Westinghouse induced President Marcos to violate his fiduciary duties through action occurring after the construction contract award, including President Marcos' intervention "to further Westinghouse's position from time to time during the course of the work on the project," and any participation with President Marcos in the "cover up" of the bribery scheme. 774 F.Supp. at 1446. *See also* Transcript at 11 (nothing that the Tribunal did not need to go beyond the issue of bribery in the formation of the contract in order to resolve the issues before the arbitrators).

The foregoing are specific examples of conduct which either was not considered by the Tribunal or would not be considered in the same manner as at trial here; they demonstrate that the issues decided by the arbitrators and Counts 3 and 8 are not " 'in substance the same.' " *Glictronix,* 603 F.Supp. at 564 (quoting *Montana,* 440 U.S. at 155, 99 S.Ct. at 974). They may or may not be the only examples of the differences between the arbitral bribery issue and Counts 3 and 8. Collateral estoppel is inappropriate because in general, Counts 3 and 8 are broader than and different from the

---

**6.** The following passages from the Damages Opinion are on point:

> The arbitrators have the responsibility to determine if there was fraud in the inducement and, if so, to what extent any of the foregoing kinds of relief or other relief should be granted.
>
> I permitted the Republic's Counts 3 and 8 claims to go forward on the basis that the bribery claims and the relief available therefor were of a *different nature altogether,* that the offense constituted simply the subverting of a person having a fiduciary interest and that the tort was committed *whether or not the bribers induced*

> *the contract.* An aggrieved person whose trust has been betrayed through bribery of his agent has a remedy against the faithless agent and he has a remedy against the individual who induced the betrayal . . . .
>
> As this case has progressed, it became increasingly apparent that the matter of payments to former President Marcos *should be treated separately from the various NPC contract claims not only for arbitration purposes but also as a matter of general law.* Damages Opinion at 8–10 (emphasis added).

issues decided by the Tribunal. This is especially true because any reasonable doubt about what was decided in a prior proceeding should be resolved against its use to estop a later proceeding. *Gregory,* 843 F.2d at 121; *Kauffman,* 420 F.2d at 1274.

In making this point I reemphasize that I have no quarrel with the conclusions of the arbitrators. *See* Transcript at 15. The issues the Tribunal decided are distinct factually and legally from Counts 3 and 8. This is why I allowed Counts 3 and 8 to proceed in this court. *See* 714 F.Supp. at 1374. Further, the standard of proof applied by the arbitrators was different from the standard of proof to be applied by the jurors in this case.

Westinghouse made two identity of issues points at oral argument which merit comment. First, Westinghouse suggested that allowing evidence at trial of payments *after* the formation of the contract would be inconsistent with my rulings on the various motions *in limine.* Transcript at 9. I do not find this to be the case and am rejecting this contention.

Second and finally, Westinghouse noted the existence of a "theoretical basis" for prohibiting the Republic from relitigating the issue of bribery in the formation of the contract while allowing evidence of bribery subsequent to the formation of the contract. *Id. See also* Westinghouse Reply Brief at 14 n. 15. Even were I inclined to divide the issues which comprise Counts 3 and 8 in this manner, collateral estoppel would not be proper on any narrower range of issues addressed by the Tribunal. At the minimum, this is because the Tribunal applied a higher standard of proof than a jury would apply at trial.

*2. Standard of Proof Applied by the Tribunal*

■ The Third Circuit has established that "disparate burdens of proof foreclose

application of the issue preclusion doctrine." *In re Braen,* 900 F.2d 621, 624 (3d Cir.1990) *cert. denied* —— U.S. ——, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991). Thus, issue preclusion, it is argued by the Republic, cannot apply where "[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action." *Restatement (Second) of Judgments,* § 28(4) (1984).

Westinghouse and Burns & Roe do not take issue with this hornbook rule but argue that it does not foreclose application to this case of the narrow exception enunciated by other circuits in *Lane,* 900 F.2d at 1252–53 (explicitly rejecting the supposition that the case suggests a broad rule of law), and *Marlene Indus. Corp. v. NLRB,* 712 F.2d 1011, 1016–17 (6th Cir.1983). *Lane* held that where the particular and actual findings rendered in the first action "suggest 'in effect, that the losing party in the first action ... would also have lost had a significantly different burden been imposed,'" those findings estop relitigation of the issues decided even though the second action imposes a lesser burden on the plaintiff. *Lane,* 900 F.2d at 1252–53 n. 7. Because the Special Master in *Marlene* had not made its conclusions in "general-verdict-like fashion," the Sixth Circuit applied collateral estoppel to the Master's particularized findings of fact concerning an unfair labor practice. It did so because the Master did "more than merely conclude that the [NLRB] had failed to prove contempt by clear and convincing evidence" and because no "special circumstances" were present. *Marlene,* 712 F.2d at 1017.[7]

Even if *Lane* and *Marlene* were the law of the Third Circuit, and even if their application to the facts might ultimately change the outcome of this motion, *see supra* note 7, I do not believe they would estop the Republic from going to trial on Counts 3

---

**7.** Irrespective of the burden of proof issue, neither *Lane* nor *Marlene* ultimately requires a different outcome on this motion. In *Lane,* a finding that the Lanes understood the implications of their transfer of stock holdings to the Special Panel defeated both the first cause of

action (for breach of fiduciary duty) and the second (for legal malpractice). *Lane,* 900 F.2d at 1250. However, the arbitral bribery findings *do not* defeat the Republic's causes of action under Counts 3 and 8. Identity of issues, unlike in the case at bar, was also present in *Marlene.*

and 8. This is because the factual findings by the Tribunal do not reach the level of specificity of the district court findings in *Lane. See Lane*, 900 F.2d at 1252 n. 7 and 1253 ("[I]t would be difficult to find more forthright findings than those reached by Judge Harris...."). Several of the Tribunal's findings might suggest that the arbitrators went beyond the relevant burden of proof. *See* Westinghouse Reply Brief at 11–13 and notes 9–11. After its discussion of the evidence alleged to invalidate the contracts and the construction contract arbitration clause, the Tribunal's ultimate conclusions depended on the applicable burden of proof. *See* Award at 76, 79 (a fair amount of evidence existed that Westinghouse intended to bribe President Marcos but that "the Defendants have failed to *carry their burden of proving* Westinghouse's alleged bribery") (emphasis added); Award at 85 ("Defendants have not established that the arbitration clause was obtained through bribery of Marcos"); Award at 57 ("Defendants have failed to *carry their burden of proving* Burns & Roe's alleged bribery") (emphasis added). I also would not apply *Marlene* because that case conditioned the holding on the absence of special circumstances, 712 F.2d at 1017, which are present in this case at a bare minimum by virtue of the Republic's unwilling participation in the arbitration. *See infra* Section 3.

Even if I reached the issues of whether the required level of specificity is met and whether special circumstances are present, and even if those conditions were met, I would not apply *Lane* and *Marlene* to this case. This is because on the facts of this case and for purposes of binding the Republic on a collateral estoppel theory, I find it impossible to evaluate the Tribunal's consideration of the evidence of bribery without reference to the burden of proof actual-

ly applied. *See Bronson v. Board of Education, Etc.*, 525 F.2d 344, 349 (6th Cir. 1975) *cert. denied* 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976) (collateral estoppel not to be rigidly applied to result in manifest injustice) (citation omitted).

It is nonetheless necessary to determine whether the Tribunal in fact applied a "preponderance of the evidence" standard or the more rigorous "clear and convincing evidence" standard. *See In re Braen*, 900 F.2d at 624 n. 1; *Wilcox v. First Interstate Bank*, 815 F.2d 522, 530–31 (9th Cir.1987); (failure to prove common law fraud by clear and convincing evidence does not bar RICO claim requiring preponderance of the evidence); *F. Buddie Contracting, Inc. v. Seawright*, 595 F.Supp. 422, 444–45 (N.D.Ohio 1984) (failure to prove fraud sufficient to overturn municipal contract does not bar antitrust action arising out of the same facts).

The Tribunal made conflicting statements on the standard of proof it would apply to the bribery issue. *See supra* Award, Section 1 (Standard of Proof) at 6–7. I do not find these statements dispositive of the question of which standard the Tribunal actually applied. Nor do I find the issue of whether they constitute "dicta" to be dispositive of the question.

I have reviewed the Award very carefully and can only conclude that, to the extent that the bribery issue overlaps the substance of Counts 3 and 8, the Tribunal applied a significantly heavier burden of proof than would be applied at trial. My conclusion rests primarily on the manner in which the Tribunal considered the evidence. By compartmentalizing and segregating the categories of evidence, the Tribunal deprived it as a whole of its natural collective force in a way in which the evidence might not be so deprived in this Court.[8]

---

**8.** This treatment is apparent throughout the award, as shown by these examples.

The Westinghouse notes stating that Disini was a "front man for Marcos' industries managed by DISINI" were considered and dismissed with the remark that "this evidence, standing alone, does not establish that Disini was in 1974 a 'front man' for Marcos." Award at 62–63.

The fact that President Marcos took with him to Hawaii stock in Herdis subsidiaries (Vulcan and The Energy Corporation) and accounting of the PNPP commissions was discounted on the theory that "Marcos' mere possession of the 'Hawaii documents,' without more, is insufficient to establish that he benefitted from the Westinghouse commissions." Award at 71–72.

Had the Tribunal actually applied a "preponderance of the evidence standard," it still might have arrived at the same conclusions. However, applying that standard it could not have found that there was no evidence of bribery. That would be inconsistent with my September 20 Opinion denying summary judgment, where I ruled that "there is ample evidence to permit a reasonable jury to find that the Disini commissions were intended to be paid in whole or in part to President Marcos and were in fact paid in whole or in part to him or upon his direction." 774 F.Supp. at 1445. Binding the Republic on a collateral estoppel theory would be improper for this reason alone.

Finally, I repeat that I have no quarrel with the conclusions of the Tribunal. It was considering somewhat different issues and applying a different standard of proof.

### 3. Parties to the Arbitration

■ Collateral estoppel may be asserted only against someone who is a party, or in privity with a party, to the prior proceeding. *Temple University v. White,* 941 F.2d 201, 212 (3d Cir.1991) *cert. denied* — U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992); *Glictronix,* 603 F.Supp. at 564. The starting point for my analysis, therefore, is my Stay Opinion of May 18, 1989.

In that Opinion I noted that "the Republic is not a party to the PNPP contract and therefore not bound directly by the arbitration clause." 714 F.Supp. at 1374. I also anticipated that under certain circumstances the Republic might not have a forum to litigate its fiduciary duty and conspiracy claims were I not to allow them to proceed in this Court. The Tribunal explic-

itly recognized my statement, Award at 116, and expressed its confidence that the Court would not "permit *any additional counts* to be litigated in the New Jersey action *as a result of* a finding by the Tribunal that the Republic is not a party to the PNPP arbitration clause." Award at 120 (emphasis added).

■ The implication of the statement is that Counts 3 and 8 would continue to be litigated in this Court. The Tribunal's statement may be "dicta," as the defendants would have it, *see* Westinghouse Reply Brief at 19 n. 24, but, considered together with the analysis presented in this section, it is sufficient to make it clear that both the Tribunal and this Court have demonstrated throughout the proceedings a clear separation of the parties to the arbitration and to this action.

The defendants nevertheless would bind the Republic, even as a non-signatory to the contracts, to the Tribunal's findings on bribery for three reasons: (i) the Republic was an active party to the arbitration up until the preliminary award and agreed that it was subject to the jurisdiction of the Tribunal for purposes of the Tribunal's ruling on the Republic's jurisdictional defenses, the principal one being that the contract (and therefore the arbitration clause) was invalid because of bribery; (ii) the Republic actively participated in and controlled the Defendants' side of the arbitration; and (iii) there is an identity of interest between NPC and the Republic in the outcome of the arbitration such that the Republic is bound by the judgment against the NPC. *See* Westinghouse Brief at 42–57.

These claims, according to the defendants, amount to more than mere "re-

---

Jesus Disini gave uncontradicted testimony that President Marcos' personal secretary demanded a deed of assignment for Herdis. Ignoring the evidence listed above, the arbitrators rejected Disini's testimony as an "allegation" without "corroborating" evidence. Award at 75.
The Burns & Roe telex inquiring about the availability of a "bag person" was disregarded as an innocent reference to someone who could assist with project financing arrangements. Award at 44.
The Burns & Roe telexes stating that the "fix is in" and "one cannot trust anyone to be dishon-

est" were dismissed as coming after Disini had already arranged to have the consulting contract awarded to Burns & Roe. Award at 56. The arbitrators refused to read these documents together with the earlier "bag person" telex. Moreover, the arbitrators appear to have concluded that Disini put in "the fix" for the benefit of Westinghouse, Award at 52, yet they considered the evidence only in connection with Burns & Roe's liability, not that of Westinghouse.

hash[ ]" of their claims regarding privity that were rejected by the Tribunal, *see* Award at 97–114, because they are grounded in the relationship between the NPC and the Republic during the arbitration. Westinghouse Reply Brief at 17–18. This much may be true, but the Republic still is not and should not be bound on a collateral estoppel theory.

With respect to (i) above, Westinghouse and Burns & Roe argue at great length that the Republic made a "tactical decision" to raise bribery as its *primary* jurisdictional defense thus presenting the issue of whether, now that the bribery issue has been decided, there should be a second trial on this "precise issue." Westinghouse Brief at 4–5, 26–28 (emphasis added). *See also* Westinghouse Reply Brief at 16 n. 19. I am not deciding whether any decision by the Republic to litigate the bribery issue *first* would estop the Republic from litigating the fiduciary duty and conspiracy claims in this Court. Suffice it to say, that my review of the record indicates that the Republic—whether as a primary or secondary matter—has adequately preserved its jurisdictional defense that it was not a party to the arbitration.

The Republic sufficiently objected to the jurisdiction of the Tribunal at various times during the proceeding. For example, the Republic and the NPC submitted their "Objections to Jurisdiction" to the Tribunal on September 19, 1989. *See* Republic Exhibit E. Therein, the Republic objected to the jurisdiction of the Tribunal because it was not a party to the arbitration clauses and expressly stated that it would join the NPC's objection that the clauses had been illegally obtained through bribery only if its threshold objection was not sustained. Republic Exhibit E at 4 n. 1. The Republic expressed the same position in Article 6 (p. 13) of the Terms of Reference for the arbitration. *See* Clary Aff. at Exhibit B. Thereafter, the Republic continued to assert its jurisdictional objection in each brief filed with the Tribunal. *See* Sources cited

at Republic Brief at 35 n. 21 and Exhibit F. It is simply of no moment in view of these repeated objections whether the Republic presented the party/non-party issue before, after or in conjunction with the jurisdictional defense of bribery. *See* Westinghouse Reply Brief at 17 n. 19.

This analysis is consistent with *Industrial Credit Co. v. Berg*, 388 F.2d 835, 842 (8th Cir.1968),[9] where the Eighth Circuit rejected the contention that a party which had been found on appeal to be outside the court's jurisdiction should be bound by the judgment "by virtue of its participation in [the earlier] litigation." "Since it was ultimately determined that the court lacked jurisdiction over Industrial," the court held, "it would be contrary to all concepts of justice to hold that it is bound by the judgment because of its forced appearance and participation in the case." *Id. See also Burbridge Found., Inc. v. Reinholdt & Gardner*, 496 F.2d 326, 328 (8th Cir. 1974); *Bunker Ramo Corp. v. United Business Forms*, 713 F.2d 1272, 1279 (7th Cir.1983). It is not on all fours with *Industrial Credit* and the other cases, however, due to the unique features of arbitral jurisdiction, which are demonstrated by this case.

It is true that the Republic agreed that the Tribunal had jurisdiction to determine its own jurisdiction pursuant to the doctrine enunciated in *Kompetenz–Kompetenz*. Award at 17–18. This presents an anomalous situation where it is not a complete misnomer—although it is misleading for collateral estoppel purposes—to call the Republic a "party" to the arbitration during the preliminary award. Indeed, the defendants would like me to read the Tribunal's dismissal of the Republic from the arbitration to support the alleged collateral estoppel implications of this misleading designation. *See* Award at 130 (the Republic is "*no longer* a party to this Arbitra-

---

**9.** The law the defendants cite in support of giving preclusive effect is inapposite because Counts 3 and 8 are not the same as the arbitral bribery issue. *See Equitable Trust Co. v. Commodity Futures Trading Comm'n*, 669 F.2d 269, 272 (5th Cir.1982); *Pastewka v. Texaco, Inc.*, 565 F.2d 851, 853–54 (3d Cir.1977).

tion") (emphasis added).[10]

*Industrial Credit,* however, demonstrates the inherent unfairness to the Republic of giving preclusive effect to a judgement after the Republic had been forced to appear and litigate against its will. *See Industrial Credit,* 388 F.2d at 842; Republic Exhibit E. *See also Bronson,* 525 F.2d at 349 (collateral estoppel not to be applied rigidly). Because it would be unfair to apply the ruling to the Republic, because the Republic sufficiently maintained its objection that it was not a party to the arbitration and because I have always believed the parties to the arbitration and this suit are separate, collateral estoppel does not apply.

Although the parties have not cited it, the law discussing the right to return to federal court after a *Pullman* abstention presents a helpful analogy. *See England v. Louisiana Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (outlining the procedures required of litigants in order to reserve federal court review of federal claims after resolution of unresolved state law issues); *Kovats v. Rutgers,* 749 F.2d 1041, 1045–47 (3d Cir. 1984). *See also Railroad Commission v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In *England* the Supreme Court recognized " 'the dilemma of a litigant who has invoked the jurisdiction of a federal court ... and finds himself remitted to the state tribunals.' " *England,* 375 U.S. at 414, 84 S.Ct. at 464 (citation omitted).

That dilemma is that a litigant cannot restrict the state court case to state law issues but risks the preclusion of his federal questions in federal court once he or she or the other party raises them in the state action. *Id.; Kovats,* 749 F.2d at 1046. *England* was grounded at least in part on circumstances that do not apply to the case at hand—the conferral of jurisdiction over federal constitutional claims on federal courts. *England,* 375 U.S. at 415, 84 S.Ct. at 464. But herein the Republic faced a similar dilemma to the federal plaintiff in *England;* having been involuntarily hailed into the arbitration—as evidenced by its repeated objections to jurisdiction—the Republic had to litigate the bribery issue with vigor, while at the same time—as evidenced by the current motions of the defendants to estop the claims in federal court—risking review of its fiduciary duty and conspiracy claims in this Court.

Also, although the Supreme Court in *England* noted that "explicit reservation is not indispensable," it held that "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his right to return to district court." *England,* 375 U.S. at 419, 421, 84 S.Ct. at 466, 467; *Kovats,* 749 F.2d at 1046. The Republic has sufficiently objected at various times that it would not be accurate or fair to characterize the Republic as an unreserved participant in the arbitration. Finally, the Supreme Court was unwilling to apply the newly-established reservation rule in *England,* which would "require af-

---

**10.** It also accounts for potential confusion over the application of federal cases to questions of the preclusive effect to be given to findings made in the course of an arbitrator's preliminary award. For example, in *Burbridge,* the Eighth Circuit held that "[o]nce the [federal district] court determined that it lacked jurisdiction, it was precluded from proceeding any further." *Id.* at 328. The timing of the district court finding of no subject matter jurisdiction accounts for this statement; on appeal, one party had attempted to bind its adversary to findings made by the district court "to further support" the district court dismissal for lack of jurisdiction. *Id.* Westinghouse and Burns & Roe might argue that *Burbridge,* therefore, does not hurt their attempt to bind the Republic, and

in a way they would be right; the arbitral bribery findings came *before* the dismissal of the Republic from the arbitration.

Even so, however, it would be formalistic and inappropriate to prevent the Republic from going to trial on Counts 3 and 8 on a collateral estoppel theory because this circumstance is a function of the arbitrators' unique jurisdiction to determine their own jurisdiction and for the other reasons discussed in this section of the Opinion. *See also, Bunker Ramo,* 713 F.2d at 1279 ("[a]ny finding made by a court when the court has determined that it does not have subject matter jurisdiction carries no *res judicata* effect," including those made after the subject matter jurisdiction determination).

firmance of the District Court's judgment," to the litigant in that case. *England*, 375 U.S. at 422, 84 S.Ct. at 468. Similar concerns of fairness inform my decision not to give preclusive effect to the Tribunal's determination on the bribery issue.

With respect to (ii) and (iii), I see no reason to address the extended arguments of the defendants based on participation, control and alleged identity of interest. *See* Westinghouse Brief at 44–57. Even were the arguments correct—and different from the privity arguments presented to the Tribunal, *see* Republic Brief at 37–38— they would not change the outcome of this motion. The Republic preserved its jurisdictional objection that it was not a party to the arbitration, the burden of proof applied by the Tribunal is different from that which will apply at trial and the issues addressed by the Tribunal are different from those which will be the subject matter of a trial on Counts 3 and 8 of the Republic's Complaint.

## CONCLUSION

In view of the foregoing, the motions of Westinghouse and Burns & Roe for summary judgment on Counts 3 and 8 and on any issues thereunder are denied.